```
              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF NEW JERSEY
```

| | |
|---|---|
| ROBERT P. GORDON | HON. JEROME B. SIMANDLE |
| Petitioner, | Civil No. 10-5065 (JBS) |
| | Criminal No. 05-698 (JBS) |
| v. | |
| UNITED STATES OF AMERICA, | **MEMORANDUM OPINION** |
| Respondent. | |

**SIMANDLE,** Chief Judge:

Petitioner Robert P. Gordon was convicted by a jury upon both counts of a superseding indictment in 2007. Count One alleged that Gordon and four co-defendants conspired among themselves and with others to manipulate the share price and illegally convert restricted shares to free-trading shares of stocks issued by Gordon's company, TeleServices Internet Group, Inc. [TSIG] and its predecessors and related companies, in a conspiracy to commit securities fraud and wire fraud in violation of 18 U.S.C. § 371. Count Two alleged that the defendants conspired among themselves and with others to launder the money that such fraudulent stock transactions produced, in an effort to hide the fact that it had come from the underlying fraud, that is, conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h). The co-defendants entered pleas of guilty. Gordon went to trial and was convicted by a jury. Gordon was

sentenced to concurrent terms of imprisonment of 60 months and 240 months on Counts One and Two respectively, and he was ordered to pay restitution of $11,620,179.90 to the numerous victims of his stock fraud scheme.[1]

This matter is before the Court following an evidentiary hearing regarding Petitioner Robert P. Gordon's application for habeas corpus relief vacating his conviction and sentence under 28 U.S.C. § 2255.  Specifically, the court convened the evidentiary hearing to determine whether Petitioner's trial and appellate counsel were deficient and whether this deficiency caused actual prejudice to Petitioner.  THE COURT FINDS AS FOLLOWS:

1. On December 19, 2011, the Court granted in part and denied in part the Government's motion to dismiss Mr. Gordon's Amended Petition to vacate his conviction and sentence pursuant to 28 U.S.C. § 2255, and granted in part Petitioner's motion for an evidentiary hearing.  [Docket Items 16 & 17.]  The Court granted the motion to dismiss as to Petitioner's Grounds 2, 3 and 4 of the Amended Petition but denied the motion as to Grounds 1 and 5 of the Amended Petition; the Court concluded that Grounds 1 and 5 (involving claims of ineffective assistance of counsel)

---

[1] The Court also found that Gordon had committed perjury in his testimony at trial, which was an obstruction of justice for sentencing purposes under U.S.S.G. § 3C1.1.  His recommended Sentencing Guideline range was determined by offense level 37 and criminal history category II, or 235 to 293 months.

presented material disputes of fact regarding the conduct of Petitioner's trial and appellate attorneys. The Court therefore granted Petitioner's motion for an evidentiary hearing as to those two remaining grounds at which the Court would take testimony of the Petitioner himself, Petitioner's trial attorney, Frank Louderback, Esq., and Petitioner's sentencing and appellate attorney, Richard F. Klineburger, III, Esq.

2. In addition to the three witnesses identified by the Court as necessary prior to the hearing (Louderback, Klineburger and Petitioner Gordon), the Court also took testimony from two additional witnesses, Burt Wiand, Esq., and James Gordon. The Court determined during the hearing that these witnesses would be helpful in resolving the disputes of fact identified by the Court in its December 19, 2011 Opinion and Order.

3. The Court concludes, after hearing the testimony of these five witnesses and reviewing the record of the underlying convictions, that Petitioner has failed to satisfy the Strickland test. Therefore, Petitioner's claims for ineffective assistance of counsel will be denied and the Court will consequently deny Petitioner's motion to vacate his conviction and sentence.

4. In Strickland v. Washington, 466 U.S. 668 (1984), the Supreme Court established a two-part test for analyzing claims of ineffective assistance of counsel. First, a petitioner must show that counsel's performance "fell below an objective standard of

reasonableness," and, second, that counsel's ineffectiveness was prejudicial.  Id. at 688, 692.  In order to satisfy the "prejudice" component of the Strickland test, a petitioner must show that a reasonable probability exists that "but for counsel's unprofessional errors, the result of the proceeding would have been different."  Id. at 694.  When applying this test the Supreme Court noted that either the performance or the prejudice prongs of Strickland may be addressed first.  In fact, the Supreme Court recommends beginning the analysis with whichever prong is easiest to satisfy or dispose of.  Id. at 697.  "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed."  Id.

 5. Petitioner's main argument supporting his ineffective assistance of counsel claim is that his trial attorney failed to subpoena witnesses, in particular, expert witnesses, to refute the government's case.  Petitioner argues that if his attorney retained an expert witness to testify about the regulations of the Securities and Exchange Commission ("SEC"), the government would not have been able to meet its burden of proof.  Petitioner testified that he urged his trial counsel to contact his former attorney from a civil matter, Burt Wiand, to serve as an expert witness in the case and his trial counsel never followed up with the contact.  Petitioner stated that he was unaware his trial

4

counsel had failed to obtain Burt Wiand as an expert until trial.

6. Mr. Louderback testified credibly that Mr. Gordon determined that he would testify and that he would be the sole witness for the defense, other than evidence obtained by cross-examination of the government's expert witness and the cooperating witnesses at trial. Indeed, this is what occurred at trial. Appellate attorney Klineburger confirmed in his testimony that Gordon told him he felt confident at trial and didn't need to call witnesses. Mr. Louderback also testified that he did not perceive the need for an expert witness and that Petitioner lacked the financial resources to obtain an expert witness. Mr. Louderback testified regarding Petitioner's professed inability to pay his attorney fees;[2] consequently, Mr. Louderback determined that Petitioner did not have the financial resources to pay for witness transportation or retention of an expert. Mr. Louderback also testified that he did reach out to some of the witnesses Petitioner suggested and that several witnesses refused to speak with him (such as Paul Henry and his attorney) or were cooperating with the government and would have been unhelpful. One potential witness, Chen Feng, was in China and Defendant

---

[2] Mr. Louderback agreed to represent Gordon under a retainer agreement of $150,000 plus travel expenses and witness costs, of which he initially paid Louderback only $20,000. The remainder was to be paid within two to three months but was never paid. Neither Gordon nor his family advanced the retainer fees and Louderback traveled and stayed in New Jersey for the four week trial without reimbursement, according to Louderback's testimony.

5

didn't provide Louderback with any means to contact him or to bring him to trial.

    7.   Petitioner testified that his family was willing to assist in paying the expenses related to witnesses and experts. In particular, Burt Wiand, Petitioner's counsel from Tampa, Florida, who defended Gordon in a prior civil case by one of the victims of this criminal scheme, says he would have agreed to serve as Petitioner's expert on SEC regulations free of charge. Burt Wiand verified this statement during his own testimony where he described reaching out to Mr. Louderback by leaving a phone message on one occasion asking Louderback to call him and receiving no response. James Gordon, Petitioner's brother, also testified to the family's alleged willingness to pay the expenses associated with witness travel and lodging.[3] There is no evidence, however, that Mr. Wiand, Mr. Gordon's family, or Mr.

---

[3] James Gordon had previously sued Robert Gordon for his losses in the TSIG investments, as James was among the numerous victims of that scheme. Although James denied being estranged from Robert by the time of trial, he also never attended the trial. James Gordon also gave a statement to the FBI that he knew that Robert Gordon had manipulated stock at Phoenix Information Systems, in which Robert made "millions" while James lost his investment of $750,000 when the company went bankrupt. (Gov't Ex. C.) James Gordon's statement to the FBI also alleged that Robert Gordon and others were involved in illegal stock deals at TSIG, in which James was also an investor, and that he had called the FBI in Florida to report these TSIG manipulations. Id. Contrary to Robert Gordon's claims in this § 2255 motion, it is inconceivable that James Gordon would have had testimony helpful to Robert Gordon if he had been called to testify at his trial.

Gordon himself raised any objection with Mr. Louderback during trial regarding the decision not to retain an expert witness.

    8. Mr. Wiand never told Mr. Louderback that he would testify as an expert in securities regulation for free, nor did Wiand even speak to Louderback[4] about the case; at most, Louderback left one unreturned phone message for Louderback. Indeed, there is a tension between Mr. Wiand's position that he would have served as an expert in this trial a thousand miles from his office for free but that his retainer fee as an attorney to defend Respondent in this trial would have been $50,000 to $100,000 for an "initial payment," according to Mr. Wiand's testimony. Mr. Wiand testified that he was able to be an expert because this was separate from the billing rate at his firm and he could personally waive any fee associated with this service, but his willingness to do so was not confirmed in any contemporaneous writing. In any event, in connection with his appearance before this Court, Mr. Wiand did not attend for free. Mr. Wiand was reimbursed for his expenses of testimony and preparation for the § 2255 hearing. This is also inconsistent with his alleged offer to be an actual trial expert witness for

---

[4] Indeed, it is not clear that Mr. Wiand even spoke to Petitioner Gordon about being a trial resource. Wiand testified he principally spoke with Respondent's brother, James Gordon, and that he didn't know where Petitioner was. He assumed Robert Gordon was embarrassed to speak to him, and he didn't have contact information for Gordon.

free.  Petitioner Gordon testified that he understood Mr. Wiand's fee for legal representation would come to $200,000 to $250,000, which he said he could not afford even with family assistance.

    9.  It is apparent that Mr. Louderback did not know of Mr. Wiand's alleged availability to testify for free as a securities law expert.  Mr. Louderback testified credibly that Gordon never suggested retaining an expert witness, nor did Gordon suggest Burt Wiand to Louderback as an expert witness.  Gordon's testimony that he told Louderback that the theory of defense for this case would be found in Wiand's file from the <u>Lemon v. Kirchoff</u> case is not credible - Gordon met frequently with Louderback in pretrial preparations in St. Petersburg and could easily have retrieved Wiand's file, also in the area in Florida, if Gordon thought it would be so useful, but he did not do so.

    10.  Gordon and Louderback discussed some possible witnesses before trial, but Gordon's testimony that he gave a witness list to attorney Louderback, which Louderback denies, is incredible.  Gordon testified he made a copy of the alleged witness list and retained it, but he has never produced it and speculates it is in storage in his brother's house.  His brother James Gordon testified on cross-examination that he has never seen the alleged list of names of potential witnesses.[5]  The best evidence of the

---

[5] On cross-examination, Petitioner Gordon elaborated that there were actually three lists of witnesses - an original list of 15 witnesses that he expanded to 34 names and then to 54

contents of a writing is the document itself, and Gordon's failure to produce his copy of the document - assuming it ever existed - precludes his testifying as to its contents. Petitioner also stated - falsely, in the Court's view - that he spoke to Louderback only 6 or 7 times in the fourteen months leading to trial. Petitioner later acknowledged in cross-examination, that he and Louderback met 5-6 times in just the first two weeks and then once every second or third week for the next fourteen months of trial preparation. Moreover, Burt Wiand's potential to testify as a trial witness was not conveyed or considered in a serious manner.[6] Trial counsel is not required to be clairvoyant.

---

names. None of these lists, whether original or copy, has surfaced. The Court strongly doubts that any such written witness list was provided by Robert Gordon to Louderback.

[6] For several reasons, it appears that Mr. Wiand's offer to testify as a free trial expert was not taken seriously. Mr. Wiand had not reviewed the charges in detail nor did he testify he had reviewed the trial record, nor has he prepared a written summary of what his expert testimony would have been. In his testimony he first says he offered to be available as a "resource," and later he testified he offered to serve as an expert witness, with no discussion of fees. He also stated that he has in fact never served as an expert in a criminal defense. It appears that, during the trial preparation phase, Mr. Wiand told Gordon he was available as a free resource. It seems implausible he was seriously offering to be a trial expert in this multi-faceted case for free, but more likely, in the Court's view, that he was available to consult with Mr. Louderback if requested, based on his general knowledge of the Lemon v. Kirchner case. He never conveyed his availability to Louderback in person or in writing, nor did he supply his file to Gordon to give to Louderback, nor did he send his file directly to Louderback.

11.  Overall, after several dozen meetings between Louderback and Defendant Gordon, the defense was in agreement that the trial strategy would be to demonstrate that there was no conspiracy, and that the alleged co-conspirators were acting independently of one another and turned on each other.  The strategy was further to establish that the many cooperating co-conspirators were unworthy of belief because their hopes for reduced sentences tainted their testimony.  Gordon would explain to the jury, among other things, that his sale of the restricted stock did not violate U.S. securities law.  Gordon, a veteran of Wall Street and the financial markets throughout his career, saw himself as knowledgeable about SEC regulations and applicable filing requirements, according to his recent testimony on cross-examination.  Gordon's testimony at trial reflected a failed strategy that Gordon himself was a victim of fraud.  Gordon's vivid testimony at trial also attempted to "sell" the jury on his version of events and the jury evidently found Gordon incredible.  According to Louderback, whom this Court again finds credible, "Gordon insisted upon this defense and it was the substance of his testimony."  (Louderback Aff. ¶ 17.)  Mr. Louderback so testified and his testimony is credible.  Such a strategy is reasonable; that it did not succeed in raising reasonable doubt does not render it incompetent.  Defendant simply could not explain away his own many and varied incriminating acts in the

10

schemes charged in the indictment, nor could he undermine the many witnesses who testified against him. See Strickland, 466 U.S. at 689 ("It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel's was unreasonable . . . . [A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy."); Marshall v. Cathel, 428 F.3d 452, 462-63 (3d Cir. 2005) ("Where an attorney's actions are the result of 'strategic choices' this presumption of reasonableness . . . is essentially irrebuttable.").

12.  Petitioner presented insufficient and implausible testimony to support his argument on how Mr. Louderback was deficient as trial counsel.  The Court finds that Mr. Louderback's trial strategy fell within the wide range of reasonable professional assistance.

13.  Petitioner has also failed to satisfy his burden to show that a reasonable probability exists that "but for counsel's unprofessional errors, the result of the proceeding would have been different."  Strickland, 466 U.S. at 694.  Plaintiff has

likewise failed to satisfy the second <u>Strickland</u> prong of demonstrating that counsel's ineffectiveness was prejudicial. <u>Id.</u>

    14.  In this case, the government's proofs against Petitioner were exceptionally strong and did not solely rely on expert testimony.  Rather, the government produced a multitude of evidence showing Petitioner bribed co-conspirator stock brokers to make unauthorized purchases of stock, concealed these unauthorized purchases in off-shore shell corporations and entered into multiple fraudulent consulting agreements with co-conspirators to conceal his sales of restricted stock.  The government proved four different schemes at trial.  Over the course of four weeks of trial, the government presented roughly 500 exhibits and 18 witnesses of whom 6 were co-conspirators.  The government offered proof of multiple instances of stock fraud and money laundering through off-shore corporations and the testimony of eyewitnesses and documentary exhibits put Gordon squarely into the middle of the scheme.  His accounts were enriched by over $7 million dollars from sales of TSIG stock while he and his co-conspirators caused over 100 victim investors to lose over $11 million on their investments occasioned by the fraud.  Gordon's own far-fetched and perjurious trial testimony deserved little weight.  The government's damning testimony and documentation came into evidence through cooperating witnesses

having first hand knowledge of Mr. Gordon's guilt.  Even with Burt Wiand's testimony, the court cannot conclude that there is any reasonable probability the result would have been different because the government's proofs at trial were overwhelming.

15.   Rather than attempting to summarize the overwhelming strength of the testimony and documentary evidence offered by the government at this four-week trial, the Court will make reference to the comprehensive closing statement amply addressing these proofs on April 5, 2007.  (See Tr. 4/5/07 at 101:22-133:18 and 150:7-158:13.)  Petitioner has not demonstrated how the outcome on either count would probably have been different but for the alleged failings of his trial counsel.

16.   Petitioner also argued in his motion that his appellate counsel, Richard F. Klineburger, III, was ineffective for failing to notify him of the decision of the Third Circuit panel affirming his conviction.[7]  Petitioner alleged this caused him to miss his deadline to file a petition for certiorari to the United States Supreme Court.  Petitioner testified that he never received notice of the denial from Mr. Klineburger.

17.   Mr. Klineburger testified at the hearing that he sent the denial notice to Petitioner's brother-in-law, Bob Breakstone, with Petitioner's permission.  Petitioner acknowledged that he

---

[7] Mr. Klineburger also represented Petitioner Gordon at his sentencing but there are no allegations he was ineffective at sentencing.

13

knew of the denial of his appeal by October 9, 2009, at the latest, as stated in his brother-in-law's email to Klineburger of that date (Ex. E), and he admitted on cross-examination that the time to seek certiorari to the Supreme Court did not expire until October 26, 2009.  Petitioner did not present any further evidence to support his ineffective assistance of counsel claim against Mr. Klineburger.

    18.  At the evidentiary hearing, Petitioner did not deny that he instructed Mr. Klineburger to forward the documents regarding the denial of his appeal to his brother-in-law nor did Petitioner deny that he authorized his brother-in-law to receive documents on his behalf.  Indeed, Petitioner conceded on cross-examination that he authorized Klineburger to communicate on his behalf with his brother-in-law, Bob Breakstone.  Petitioner also presented no evidence showing his brother-in-law had not received the requested documents.  The Court believes Mr. Klineburger.  The Court finds that Mr. Klineburger gave timely notification to Petitioner's brother-in-law, Bob Breakstone, who was the person designated by Petitioner to receive such communications on his behalf.  Petitioner has not demonstrated that Klineburger's performance as appellate counsel was deficient.  Petitioner quite plainly has attempted to fabricate a claim of ineffectiveness against Mr. Klineburger.

    19.  Mr. Klineburger also testified to an attempt by

Petitioner Gordon to work a fraud upon the court.  He testified that Gordon wanted Klineburger to obtain free transcripts under the Criminal Justice Act by declaring himself to be in forma pauperis.  Klineburger refused to make such an application for free trial transcripts for purposes of appeal because he believed it would be a fraud on the court, given Gordon's access to sufficient assets to afford transcripts.  (Such assets included a retainer fee for sentencing and appeal paid to Klineburger in the amount of approximately $50,000.)  Gordon's willingness to lie to the jury during trial and to propose to lie about his financial assets post-trial are several reasons undermining Gordon's credibility in this § 2255 motion.

20.   However, even if Petitioner had shown Mr. Klineburger did fail to notify him of his appeal's denial, this would not be sufficient to support a claim for ineffective assistance of appellate counsel.  Review by the Supreme Court is discretionary and a defendant has no right to counsel to pursue discretionary review.  Wainwright v. Toma, 455 U.S. 586, 587-88 (1982).  Consequently, "any alleged neglect on the part of defendant's attorney in failing to notify defendant when his appeal to the Third Circuit had been denied would not rise to the level of a constitutional violation."  United States v. Ferrell, 730 F. Supp. 1338, 1340 (E.D. Pa. 1989).  See also Darby v. U.S., No. 10-1437, 2010 WL 4387511, *9 (D.N.J. October 28, 2010)(holding

15

failure by appellate counsel to inform defendant of outcome of appeal is not ineffective assistance of counsel because a defendant has no constitutional right to counsel for purposes of seeking Supreme Court review.)

21.   Under the teachings of <u>Strickland</u>, "the ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged." <u>Strickland</u>, 466 U.S. at 696. For the above reasons, this Court finds nothing in the record to demonstrate that the result of the trial and the appeal in this case was unreliable due to any alleged ineffectiveness of counsel.

22.   Accordingly, Petitioner has failed to establish his claims for ineffective assistance of trial counsel and appellate counsel and his motion to vacate, alter or amend his sentence will be denied.

23.   Pursuant to 28 U.S.C. § 2253(c)(1)(B), "[u]nless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from the final order in a proceeding under section 2255."  A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." § 2253(c)(2).  To satisfy that standard, a petitioner must demonstrate that "jurists of reason could disagree with the district court's resolution of his constitutional claims or that

jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." Miller-El v. Cockrell, 537 U.S. 322, 327 (2003). Here, jurists of reason could not disagree with the Court's resolution of Petitioner's constitutional claims. Under the standard recited above, the Court will deny a certificate of appealability.

The accompanying Order will be entered.

**May 30, 2014**             **s/ Jerome B. Simandle**
Date             JEROME B. SIMANDLE
           Chief U.S. District Judge